*Daniel S. Muffoletto v. Donna S. Towers and the Council of Unit Owners of Cambridge Landing Townehouse Condominium*, No. 1850, September Term, 2017.  Opinion by Kenney, J.


**STATUTE OF LIMITATIONS – COMPUTATION OF PERIOD OF LIMITATION – ACCRUAL OF RIGHT OF ACTION OR DEFENSE – CONTINUING INJURY**

The continuing harm doctrine rests on a new affirmative act, and does not apply to a continuing effect of an earlier act, which, in this case, was the alleged moving of the mooring piles.

**EQUITY – LACHES AND STALE DEMANDS – NATURE AND ELEMENTS IN GENERAL**

Laches is an equitable defense intended to ensure fairness in the judicial system.  Based upon grounds of sound public policy, it discourages fusty demands for the peace of society.  It applies when an aggrieved party has burdened the defense by an unreasonable delay in asserting a cause of action.

**EASEMENTS – CREATION, EXISTENCE, AND TERMINATION – NATURE AND ELEMENTS**

An easement is a nonpossessory interest in the real property of another, and therefore, an incorporeal interest in real property.

**EASEMENTS – CREATION, EXISTENCE, AND TERMINATION – PRESCRIPTION – IN GENERAL**

An easement can be created expressly or by implication.  A prescriptive easement arises when a party makes an adverse, exclusive, and uninterrupted use of another's real property for twenty years.  A party's use is adverse if it occurs without license or permission.  When a person has used a right of way openly, continuously, and without explanation for twenty years, it is presumed that the use has been adverse under a claim of right.  The burden then shifts to the landowner to show that the use was permissive.

**WATER LAW – RIPARIAN AND LITTORAL RIGHTS – IN GENERAL – WHO ARE RIPARIAN OWNERS**

Under Md. Code (1982, 2014 Repl. Vol., 2019 Cum. Supp.), § 16-201(a) of the Environment Article, a riparian landowner is "the owner of land bounding on navigable water."  A riparian landowner's rights include the right: of access to the water; to build a

wharf or pier into the water; to use the water without transforming it; to consume the water; to accretions; and to own the subsoil of nonnavigable streams and other private waters.

**WATER LAW – RIPARIAN AND LITTORAL RIGHTS – EASEMENTS**

An easement or a license of a riparian right does not equate to the ownership of a riparian right. And the grant of an easement relating to water does not carry any riparian or other rights beyond those strictly necessary to the easement's express purposes.

**APPEAL AND ERROR – SCOPE AND EXTENT OF REVIEW – DISCOVERY – SANCTIONS**

When ruling on discovery disputes, circuit courts have broad discretion in determining whether sanctions should be imposed. But before imposing sanctions, a circuit court should consider the factors set out in *Taliaferro v. State*, 295 Md. 376, 390–91 (1983), and whether the sanctioned violations were persistent and deliberate.

It is not necessary for the court to go through a checklist and note its consideration for each factor because these factors frequently overlap and do not lend themselves to a compartmental analysis. For that reason, we do not look at each incident in isolation, but rather we look at the entire history and context of the case.

Circuit Court for Dorchester County
Case No. 09-C-16-23604

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1850

September Term, 2017
_____

DANIEL S. MUFFOLETTO

v.

DONNA S. TOWERS and THE COUNCIL
OF UNIT OWNERS OF CAMBRIDGE
LANDING TOWNEHOUSE
CONDOMINIUM
_____

Berger,
Arthur,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.*
_____

Opinion by Kenney, J.
_____

Filed: January 31, 2020

*Kehoe, Christopher, J., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This is the tale of two adjacent boat slips that began over thirty years ago when John Tieder bought a boat. The boat slips were developed as part of a waterfront condominium project developed by Chas E. Brohawn & Bros. Inc. ("Brohawn Company") and are now owned by the Council of Unit Owners of Cambridge Landing Townehouse Condominium ("Council"). The slips are separated by mooring piles. What was once Mr. Tieder's boat slip is nineteen-feet wide; the adjacent slip is thirteen-feet wide.[1] The widths of the two slip spaces went uncontested through multiple condominium unit sales and beyond the deaths of Mr. Tieder and Lee Brohawn, who was a friend of Mr. Tieder and a principal in the Brohawn Company.

Daniel Muffoletto, appellant, the successor-in-interest to Michael and Susan Dickinson ("the Dickinsons"), who first licensed the slip adjacent to Mr. Tieder's slip, contests the widths of the two slips.[2] Mr. Muffoletto contends that both of the two boat slips were intended to be sixteen feet in width and that the mooring piles separating the two slips were moved to accommodate Mr. Tieder's boat.

---

[1] Mr. Tieder bought Unit 311-A in the name of his company, John W. Tieder, Inc. For the purpose of this opinion, we will refer to Mr. Tieder as the owner of the unit and the licensee of the boat slip.

[2] In the Circuit Court for Dorchester County, Mr. Muffoletto sued Donna S. Towers, an appellee and the successor-in-interest to Mr. Tieder, and the Council. The Council and Mr. Muffoletto have resolved this matter between them. As a result, the Council is no longer participating in this appeal but agrees to be bound "by any final non-appealable decision of this Court or the Circuit Court on remand."

On appeal, Mr. Muffoletto presents four questions,[3] which we have rephrased and consolidated into two:

1. Did the circuit court err in granting summary judgment to Mrs. Towers?

2. Did the circuit court err in awarding sanctions for discovery violations?

We answer both questions in the negative and affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

The related condominium units are, like the two boat slips, adjacent to one another. One is unit number 311-A; its licensed slip is number 32. Unit 311-A was purchased by Mr. Tieder in 1983, and sold to Donna S. Towers in 2000. The other is Unit 312-B; its licensed slip is number 33. Unit 312-B was purchased by Michael and Susan Dickinson in 1983. The Dickinsons sold it to Lloyd Godfrey who sold it to Mr. Muffoletto in 2004.

---

[3] Mr. Muffoletto asked:

1. Did the trial court err in granting summary judgment to Mrs. Towers where appellant sought a declaratory judgment concerning riparian rights in a condominium regime?
2. Did the trial court err in holding that a portion of the non-corporeal license at issue in the case could be lost to adverse possession to a party that also had at most a non-corporeal interest?
3. Did the trial court err in denying summary judgment to [Mr. Muffoletto] where the title instruments refer to unambiguous diagrams showing piling locations?
4. Did the trial court err in awarding sanctions for discovery violations without considering the *Taliaferro* [*v. State*, 295 Md. 376 (1983)] factors.

2

The Site Plan for Cambridge Landing, dated April 13, 1982, indicates that slips 32 ("Towers slip") and 33 ("Muffoletto slip") would be fourteen-feet-and-seven-inches wide with mooring piles separating the two slips. The Brohawn Company was responsible for the development and construction on the property. The marine-related construction, including the finger piers and mooring piles, was outsourced to Apple Marine Construction Company, a company owned by George Apple. According to Mr. Apple's affidavit, installation was completed in 1982.

The actual location of the mooring piles between 1982 and 1984 is uncertain, and there are differences between the Site Plan and the installation. The combined width of the two slips shown on the Site Plan is approximately three feet less than the combined width of the two slips as presently configured and that difference is not reflected in the construction documents presented to the circuit court. The aerial photo taken in June of 1984 by the U.S. Army Corps of Engineers shows the Towers slip and the Muffoletto slip as being nineteen and thirteen-feet wide, respectively, for a consolidated width of thirty-two feet.

With regard to the widths of the two slips, three people, in four affidavits filed in this case, attested to different facts. Terry Robbins, daughter of Lee Brohawn and an employee of the Brohawn Company in 1983, avers that the pilings were originally placed as they are now—that they were never moved and that the Towers slip and Muffoletto slip, respectively, have always been nineteen-feet and thirteen-feet wide. George Apple,

3

owner of Apple Marine Construction Company, avers that the pilings were installed according to "drawings supplied with the permit" from the Army Corps of Engineers.[4]

John W. Tieder, III, the son of Mr. Tieder, submitted two affidavits. In the first, he states that his father and Lee Brohawn were "close friends," but that he did not know what the initial plans for the slips may have been or about any conversations between his father and Lee Brohawn regarding them. In a second affidavit, and without reference to when it happened, he remembered going with his father to mark "where he wanted the pilings moved in order to accommodate his boat, increasing the size of the slip for Unit 311A and decreasing the size for Unit 312B."

On April 7, 1983, the Dickinsons paid for the license to slip 33; Mr. Tieder paid for the license to slip 32 on April 13, 1983. Cambridge Landing records reflect receipts for both slip licenses. The Dickinsons' Exclusive License for Boat Slip is in those records; the Tieder license is not. The actual widths of the slips are not reflected in the licenses or the unit purchase documents.

In 1996, the Brohawn Company granted all riparian rights, which it had previously reserved, to the Council, subject to prior licenses to boat slips issued by the Brohawn Company.[5] Three years later, the Council adopted a policy requiring a unit owner who

---

[4] The Army Corps of Engineers' permit includes a version of the Site Plan. As previously described, the drawings included with the permit indicate that the combined width of the two slips would be twenty feet and two inches and that slips 32 and 33 would be fourteen-feet-and-seven-inches wide.

[5] The Brohawn Company granted these rights to the Council in a Deed that stated, in pertinent part:

had made any changes to any mooring piles to return the piles to their "original" location when the unit is sold.[6] Shortly after this policy was adopted, Mr. Tieder sold his unit to Mrs. Towers who was issued a Cambridge Landing Townehouse Condominium Deed of Easement for Boat Slip for slip 32, dated August 11, 2000. That document included a reference to a Site Plan for delineation of the slip and stated that the use of the slip was "as now constructed."

Mr. Muffoletto points out that Mrs. Towers's husband, who was then-President of the Council, executed that easement on behalf of the Council, and contends that Mr. Towers was an interested party and therefore prohibited from granting the easement without the written consent of the Council. No one on the Council or any other unit owner has raised an issue in regard to Mrs. Towers' easement for slip 32 in the sixteen

(…continued)

> EXPRESSLY SUBJECT HOWEVER, to *all of the prior Exclusive Licenses For Boat Slips previously executed and recorded by the Grantor to each of the twenty (20) unit owners of the condominium regime*."

(Emphasis added).

[6] Mr. Muffoletto indicates that he first learned of the policy at a Council meeting in 2010. Minutes of that meeting state:

> SLIP ENLARGEMENT REQUEST. Unit 415 owner, Ralph Dill, submitted a request for permission to increase the size of the licensed boat slip for Unit 415, slip #37. Following discussion of the request and noting a precedent has been set by approval of previous requests, motion was made, seconded and passed unanimously to approv[e] Ralph's request with the agreement that when it is no longer in use by him or prior to his departure from Cambridge Landing, the slip will be returned to the original dimensions at the unit owner[']s expense.

5

years between the granting of the easement and the filing of this case. And, its terms are consistent with other licenses or easement agreements issued.

On June 18, 2004, twenty years and three days after the aerial photo showing the present location of the piles was taken, Mr. Muffoletto bought Mr. Godfrey's condominium unit and licensed slip 33. Shortly after he "settled on the unit and attempted to get [his] boat in the slip," he discovered the "difference in the [two] slips." He later met with Mrs. Towers to inquire about the difference in the slip width.

Mr. Muffoletto became a member of the Council in February of 2010. As previously noted, he claims that he gained "actual knowledge" of the 1999 policy at a Council meeting in September of 2010. In his Opposition to [the Council's] Motion for Summary Judgment, he asserts that in July of 2014 he discovered the possibility that the original placement of the mooring piles was different from what it is now and that the two slips were intended to be of equal width.

On November 15, 2016, Mr. Muffoletto filed a complaint in the Circuit Court for Dorchester County against Mrs. Towers and the Council, alleging:

> Upon information and belief, *after the Council took title to the Boat Slips*, and before Mrs. Towers' and Mr. Muffoletto's ownership of their respective condominium units and corresponding boat slips, predecessors in title to Mrs. Towers and Mr. Muffoletto moved the pilings demarking the Towers Slip and the Muffoletto Slip to enlarge the Towers' Slip from sixteen feet (16') to nineteen feet (19') and reducing the Muffoletto Slip from sixteen feet (16') to thirteen feet (13').

6

(Emphasis added). He sought a declaratory judgment that slips 32 and 33 were intended and initially constructed to be equal widths of sixteen feet each.[7] He further requested, by way of specific performance relief, that the piles be moved to "deliver to him a slip measuring sixteen feet in width." And he sought permanent injunctive relief that the piles be moved.[8]

In response to Mr. Muffoletto's Complaint, Mrs. Towers and the Council moved for a dismissal or, in the alternative, summary judgment. On May 17, 2017, the circuit court ultimately denied the motion to dismiss, reasoning that it was "unable to resolve—at this juncture—a factual dispute as to the duration of time that the pilings have been located in their current position." It also denied the defendants' alternative motion for summary judgment because of the unresolved material dispute as to whether the piles between slips 32 and 33 had been moved:

> [Mr. Muffoletto] pointed the Court's attention to a potential dispute as the fact of when, precisely, the pilings were moved by [Mr. Muffoletto]'s and [Mrs.] Towers' predecessors in title. This point would certainly be relevant and material to the Court's determination as to whether [Mrs.] Towers has a quasi-prescriptive easement or an analogous right relating to Boat Slip 32.

---

[7] "Mr. Muffoletto respectfully requests . . . that the Court declare that [slip 33] was originally constructed to be of equal size to [slip 32], measuring sixteen (16') feet wide, and further order the Council and/or Mrs. Towers to pay the costs to have the pilings moved back to their original location as well as granting Mr. Muffoletto the costs of these proceedings."

[8] "Mr. Muffoletto respectfully requests that this Honorable Court . . . require Mrs. Towers and/or the Council, at their sole expense, to move the pilings dividing [slips 32 and 33] back to their original position such that both slips measure sixteen (16') feet . . . and further order Mrs. Towers and/or the Council to pay Mr. Muffoletto's costs and attorneys' fees incurred as a result of these proceedings."

7

The parties proceeded to discovery. Both Mrs. Towers and the Council served Mr. Muffoletto with interrogatories related to whether the piles had been moved. Having received what it considered non-responsive answers, Mrs. Towers filed a Motion for Order to Compel Proper Discovery Responses on July 27, 2017.[9]

In July of 2017, the circuit court ordered Mr. Muffoletto to submit proper discovery responses to each of the defendants in this case, but, due to a clerical error, that order was not sent. The Council filed a request for additional supplemental answers, which Mr. Muffoletto received on August 1, 2017. On September 8, an amended Order to Compel Proper Discovery Responses was sent to Mr. Muffoletto, giving him ten days to comply. He submitted his answers on the tenth day, but only to the Council. Mrs. Towers responded with a Limited Motion for Sanctions. Based on that motion as amended, the court ordered that he respond by September 28, which he did not do.

On October 2, 2017, the circuit court considered sanctions for Mr. Muffoletto's failure to provide proper discovery responses after confirming that: Mr. Muffoletto had not signed his initial set of Answers to Interrogatories establishing that they were made under oath; he had not responded to either the Limited Motion for Sanctions or the amendment; he had not consistently given answers to both opposing parties during the discovery process; and he had not consistently filed Certificates of Service with his

---

[9] On appeal, Mr. Muffoletto explained that he was "*pro se* during much of the discovery period." According to Mrs. Towers, Mr. Muffoletto's first counsel withdrew after the circuit court filed its May 17, 2017 order and he was *pro se* up until the eve of the October 2, 2017 hearing.

8

discovery papers.[10]  Mr. Muffoletto responded that both defendant parties had then received all of his answers to interrogatories.  Finding a failure to provide responses as

[10] The circuit court's comments regarding discovery at the October 2, 2017 hearing included:

> [COUNSEL FOR MRS. TOWERS]: We have had, and I'm sure you've seen this in the pleadings, some difficulties getting all the filings that Mr. Muffoletto makes.  [The Council] gets some.  I get some.
>
> THE COURT: Yeah, I saw that.
>
>            \*       \*       \*
>
> THE COURT: . . . [Counsel for Mrs. Towers] . . . at some point you realized I think maybe from one of Towers's pleadings that there was a response [or] there was some admission and then [counsel for the Council] shared that with you.
>
>            \*       \*       \*
>
> [COUNSEL FOR THE COUNCIL]: Your Honor, just briefly.  I had a Motion to Compel as well and Mr. Muffoletto did provide me some supplement responses.  He has never technically signed his initial Answers to Interrogatories.  So I just want an admission that, "Hey, yes, they're under oath" with regard to the initial set of Interrogatories that were propounded that didn't have a verification associated with them.
>
> THE COURT: Uh-huh.  Okay.  Do you want to respond to that, sir, in terms of representing the plaintiff here?
>
> [COUNSEL FOR MR. MUFFOLETTO]: All right.
>
> THE COURT: I mean, that was pretty frustrating for the court.  I was kind of a party to seeing some of the filings and letters and things like that.  You know, as you know, the rules are precise rubrics to be followed and . . .
>
> [COUNSEL FOR MR. MUFFOLETTO]: [We'll] sign the original Interrogatories.
>
>            \*       \*       \*

[COUNSEL FOR MRS. TOWERS]: [We did not] get a response to the limited motion [for sanctions].

THE COURT: Okay. So, so he didn't respond to either one.

*     *     *

THE COURT: Well, here's how I see it . . . this goes back to the initial Motion for Order to Compel Proper Discovery Responses . . . .

*     *     *

THE COURT: Mr. Muffoletto was certainly on notice that there was a discovery dispute. I issued my order . . . [which went out on] [t]he 8th day of September 2017 and there was absolutely no response from Mr. Muffoletto to that order.

There was also no response to either the Limited Motion for Sanctions and Correction to Limited and Supplement to Limited Motion for Sanctions. That wasn't filed on or before September 28, 2017 as I had requested . . . . The problem here is Mr. Muffoletto had an opportunity to respond and didn't respond to even those. It just shows a contempt for the process.

And again, this, this case has been on track and has been scheduled and everybody has been here and has really put in their time, their talent and their treasure into this case and I can't further delay it.

And I do believe that the sanctions are appropriate[.]

*     *     *

THE COURT: . . . I clearly articulated what would happen if Mr. Muffoletto did not respond to the discovery requests identified in the Motion For Order to Compel, which he didn't do that; and I also instructed him, or his counsel, to file responses to Defendant's Limited Motion for Sanctions and Correction and Supplement to Defendant's Limited Motion for Sanctions by September 28, 2017, which he did not do as well . . . Alternatively, he filed responses that are very much consistent with the

10

ordered and prejudice to Mrs. Towers, the circuit court concluded that sanctions were "appropriate."[11]

_____

(…continued)

relief that [counsel for Mrs. Towers] is requesting and he didn't follow the procedures and didn't serve the rest of the parties involved in the litigation . . . it's only by almost grace here that the parties here communicated and, and [counsel for Mrs. Towers] was able to glean from responses that there was information that Mr. Muffoletto provided to [counsel for the Council].

So again, this is his – this is all on [Mr. Muffoletto].

\*   \*   \*

[COUNSEL FOR MR. MUFFOLETTO]: . . . [W]hat is the prejudice on which these sanctions are based, because I really don't see that? My client has produced in all the affidavits, all the documents that show everything that is known, the entire universe of what is known about when these pilings were installed and moved[.]

\*   \*   \*

THE COURT: . . . [T]he prejudice is we're on October 2 here and [counsel for Mrs. Towers] is sitting here with a client that has probably paid for his services and he doesn't have those responses and so it is –

[COUNSEL FOR MR. MUFFOLETTO]: He does. He does have those responses.

\*   \*   \*

THE COURT: He says he does not . . . and I didn't receive – there hasn't been any service of discovery that was noted with the court. Correct; [counsel for Mrs. Towers]? There hasn't been anything in the court's filing that discovery was served.

[COUNSEL FOR MRS. TOWERS]: The only thing we've gotten is [the Council's counsel] would bring me up to date when he'd get something. .

[11] The circuit court responded:

11

The court scheduled a disposition hearing for November 8, 2017. At that hearing, the court entered sanctions against Mr. Muffoletto in the amount of $4,331.[12] Summary judgment in favor of Mrs. Towers and the Council was entered on November 20, 2017.

Mr. Muffoletto filed a timely appeal to this Court.

## DISCUSSION

## I.

## Granting Summary Judgment to Mrs. Towers

### *Contentions*

Because he had requested a declaratory judgment and the need for credibility findings as to the witnesses,[13] Mr. Muffoletto contends that the court erred when it

---

(…continued)

> [T]he fact is established, as I'm permitted to do pursuant to Rule 4, 4-233, because of your client's failure to provide responses as he's been ordered . . . .
>
> \*     \*     \*
>
> [Mrs. Towers's counsel] is sitting here with a client that has probably paid for his services and he doesn't have those responses . . . I didn't receive— there hasn't been any, any service of discovery that was noted with the court."

[12] This amount was one-half the amount that Mrs. Towers's counsel reported that she spent in her attempts to gather proper responses.

[13] The circuit court found that "[t]he pilings . . . , if they were moved at all, were moved prior to June 15[], 1984[]" and that "[Mr. Tieder and Mr. Brohawn] would have had knowledge as to whether the pilings . . . were moved or not and if they were moved, when, and why. Without this material information defendants are severely prejudiced[.]" We understand the court to be saying that it could not make the declaration requested by

12

granted summary judgment to Mrs. Towers and the Council. In his view, until the circuit court issued a declaration of the rights and duties of Mr. Muffoletto, Mrs. Towers, and the Council in regard to slips 32 and 33, it could not grant summary judgment to Mrs. Towers.[14] In asserting that the court erred in granting summary judgment based on limitations or laches, Mr. Muffoletto contends that limitations renew every day that the mooring piles remain in their present location.

Mrs. Towers contends that the circuit court "made its required declaration in its Order dated November 13, 2017,[15] having explained the bases for its findings at the

_____

(…continued)
Mr. Muffoletto and that engaging in credibility determinations would not be useful because none of the possible witnesses could answer all questions regarding whether the pilings were moved, and, if so, when and why. Moreover, it was not necessary to do so based on its rulings related to limitations and laches.

[14] Mr. Muffoletto argues that the court "[had] to address the interrelated questions of whether the rights to the slips were intended to be of equal width, whether they were originally constructed in equal widths, and what rights were actually transferred. At no point did the trial court engage in this determination. . . . Summary judgment should not have been granted to the Defendants for this reason as well."

[15] In its November 13, 2017 order, the circuit court declared the rights of the parties as follows:

1.  The placement of the pilings marking the boundaries of Boat Slip 32 for Unit 311-A are correctly and lawfully located in their present position *consistent with the presently recorded license and/or easement for the use of that slip* and the pertinent documents of the Council of Unit Owners Of Cambridge Landing Townehouse;
2.  The placement of the pilings marking the boundaries of Boat Slip 33 for Unit 312-B are correctly and lawfully located in their present position *consistent with the presently recorded license and/or easement for the use of that slip* and the pertinent documents of the Council of Unit Owners Of Cambridge Landing Townehouse; and,

13

hearing on November 8, 2017."  She further contends that continuing harm from a single

act does not renew the statute of limitations, and that the single act in this case was the

alleged moving of the piles that occurred sometime prior to June of 1984.

*Standard of Review*

We have explained:

> The "'standard of review of [a] [ ] declaratory judgment entered as the
> result of the grant of a motion for summary judgment is whether that
> declaration was correct as a matter of law.'"  *Olde Severna Park
> Improvement Ass'n v. Gunby,* 402 Md. 317, 329 (2007) (quoting *South
> Easton Neighborhood Ass'n v. Town of Easton*, 387 Md. 468, 487 (2005)).
> Our review of the court's entry of summary judgment is *de novo.  Am.
> Powerlifting Ass'n v. Cotillo*, 401 Md. 658, 667; *Tyma v. Montgomery
> County*, 369 Md. 497, 504 (2002).

*Prime Venturers v. OneWest Bank Grp., LLC*, 213 Md. App. 122, 134 (2013) (cleaned

up); *see Emerald Hills Homeowners' Ass'n v. Peters*, 446 Md. 155, 161–62 (2016).

*Analysis*

**Statute of Limitations**

Md. Code Ann. (1974, 2013 Repl. Vol., 2019 Cum. Supp.), § 5-101 of the Courts

and Judicial Proceedings Article ("CJ") provides:

---

(…continued)
> 3. Neither [Mrs. Towers or the Council] is or will be required to modify
>    the location of those pilings or to make any payment to [Mr.
>    Muffoletto].

(Emphasis added).

14

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

Mr. Muffoletto's argument against summary judgment rests generally on the need for credibility assessments to determine whether, when, and why the mooring piles were moved.[16] But the circuit court concluded that the possible movement of the piles was not a disputed material fact because they were placed in their current location no later than June of 1984, and any action at law related to their present location was barred by limitations in 1987.

In his Opposition to [the Council's] Motion for Summary Judgment, Mr. Muffoletto claimed that he was justified in waiting twelve years to file the complaint because he did not discover that the original placement of the piles may have created two slips of equal width until July of 2014.

In response to that argument, the circuit court found that:

---

[16] Relying on *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 256, Mr. Muffoletto argues that the court could not enter summary judgment without first issuing a document outlining the rights of the parties as requested in his Verified Complaint for Declaratory Judgment, Breach of License and for Permanent Injunctive Relief. Here, instead of a separate document, the circuit court included the declaration of the parties' rights in an amendment to the November 9 order, which was entered on November 20. But, as *Lovell* instructs, the failure to enter a separate declaration of rights "is not a jurisdictional defect," and we can "review the merits of the controversy and remand for entry of an appropriate declaratory judgment." 408 Md. at 256 (internal citation and quotation marks omitted); *see also Moose v. Fraternal Order of Police*, 369 Md. 476, 488 (2002) (explaining that an appellate court may also *sua sponte*, on public policy grounds, address the appropriateness of a case for a declaratory judgment). We will do so in this case by remanding to the circuit court to enter the rights declared in its November 13, 2017 Order as a separate declaratory judgment.

15

[Mr. Muffoletto's] cause of action accrued when [he] knew or should have known of the breach, it is undisputed that [Mr. Muffoletto] was aware that his boat slip was narrower . . . in 2004 shortly after he purchased and took title to Unit 312B . . . . [Mr. Muffoletto] was present [in 2010] when the policy of moving pilings associated with boat, boat slips was discussed in and adopted by the Council of Unit Owners.

[Mr. Muffoletto] then was on inquiry notice because he knew the slip was narrower in width than the Towers slip and he knew of the policy of moving slips at the very latest by 2010; yet, he waited until November 17[], 2016 to file his complaint, which is six years after he could have been on inquiry notice.

Mr. Muffoletto advanced the concept of "continuing harm," to toll the statute of limitations. *Litz v. Maryland Department of Environment*, 434 Md. 623 (2013) and *Walton v. Network Solutions*, 221 Md. App. 656 (2015) are instructive.

In *Litz*, the plaintiff filed suit against a nearby town for implementing sewage policies that polluted a lake on her property. 434 Md. at 630–33. Although she had been aware of the pollution for much longer than three years, the Court of Appeals concluded that, in the context of a motion to dismiss and claims of negligence and trespass, the statute of limitations could be tolled based on allegations in the complaint that the town had an ongoing duty to limit the pollution, but "'*continuously*' discharges [contaminated] 'ground and surface water . . . onto Litz's property.'" *Id.* at 649. In addition, nothing in the complaint indicated that the town had not continued to approve septic systems that channel and discharge polluted groundwater onto the Litz property within three years of the complaint. *Id.* at 650.

In *Walton*, the plaintiff had asked to be removed from an email solicitation but remained on an email list and continued to be sent solicitations and advertisements. 221

16

Md. App. at 660. He argued that the continuing emails tolled the statute of limitations. *Id.* at 675. Reviewing the application of the continuing harm doctrine in the light of *Litz* and *Duke Street Ltd. Partnership v. Board of County Commissioners of Calvert County*, 112 Md. App. 37, 50 (1996), we concluded the single violation was the failure to remove the plaintiff's name from the email list. *Id.* at 674. We explained that "[c]laims that are in the nature of a 'continuous tort[]' . . . can extend the period of limitations due to their new occurrences over time." *Id.* at 676 (quoting *Duke St. Ltd. P'ship*, 112 Md. App. at 47). But the continuing harm doctrine did not apply in that case because the continuation of emails was a "continuing ill effect[]" of the earlier breach. *Id.*

Maryland appellate courts have consistently held that the continuing harm doctrine rests on a new affirmative act. *See Litz*, 434 Md. at 650 (stating that sewage leaking into a water source is an effect rather than an act directly traceable to the Town, but the Town's continuing approval of problematic sewage plans would be a directly traceable act); *see also MacBride v. Pishvaian*, 402 Md. 572, 584 (2007) (holding that an apartment's deteriorating state was not a new breach because deterioration is not a traceable act). Here, the alleged directly traceable act causing Mr. Muffoletto's loss of slip space—the alleged moving of the piles—occurred sometime prior to June of 1984. But leaving them in place is a continuing effect of that act. *See Walton*, 221 Md. App. at 674, 676–77.

17

We turn now to issuance of the Deed of Easement to Mrs. Towers by the Council.[17]  The Deed of Easement granted on August 11, 2000 to Mrs. Towers provides:

> NOW, THEREFORE, WITNESSETH, that for and in consideration of the premises, and other good and valuable considerations, the Grantor does hereby grant, convey and assign unto Donna S. Towers, and to her personal representatives, heirs and assigns, the "Grantee," the exclusive use of boat slip number 32, *as now numbered*, and as delineated upon Exhibit A attached hereto and incorporated herein by reference, and *as now constructed*, which slip is adjacent to the aforesaid condominium regime as shown on the aforesaid recorded plats[.][18]

(Emphasis added).

In 1999, the Council adopted a policy requiring slip owners who had moved piles and who were selling their units to move piles to their original location.[19]  The minutes of that meeting do not indicate whether "original" means "as first built" or "as constructed when the Council acquired riparian rights in 1996."[20]  But in regard to limitations, it does not matter.  If "original" refers to the location of the piles when the riparian rights were transferred to the Council, neither Mr. Tieder nor the Council would be required to do

---

[17] As previously mentioned, Mr. Muffoletto advances procedural problems in granting Mrs. Towers her slip license, but issuance of the easement for slip 32 "as now constructed" was never objected to by anyone within the three-year limitation period.

[18] The deed to the unit from Mr. Tieder to Mrs. Towers also conveyed all "right, title, and interest in and to boat slip No. 32, as now numbered and as now constructed[.]"

[19] The Council explains the policy as: "a unit owner could seek to move pilings associated with a boat slip assigned to him or her.  However, the owner was required to return the pilings to their original location and configuration when their use was no longer necessary or when the owner sold his/her unit."

[20] The Council's objections to the request for documents prior to obtaining the riparian rights in its Answers to Mr. Muffoletto's First Set of Interrogatories suggests that the Council considered "original" to mean as of 1996.

18

anything because, in 1996, the mooring piles were in the position they are now. And if it meant the initial placement and that the Council had a duty to enforce the policy for relocation of pilings that moved prior to its receipt of the riparian rights, Mr. Tieder could have been required to relocate the mooring piles when he sold this unit to Mrs. Towers in 2000. We are not persuaded that the Council's issuance of the new license to Mrs. Towers without enforcing the policy was a new act under the continuing harm concept, but, if it were, it would only extend limitations to 2003.

Mr. Muffoletto, who bought his unit in 2004, contends that he was unaware of the pile relocation policy until September of 2010. If we were to accept that contention and attribute his unawareness of the policy to Mrs. Towers or the Council hiding information from him, limitations would have expired in September of 2013. *See* CJ § 5-203 ("If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or *by the exercise of ordinary diligence should have discovered* the fraud.") (emphasis added).

This suit was filed on November 15, 2016, which was twelve years and five months after Mr. Muffoletto bought his property, and no less than twelve full years after he attempted to bring his boat into the slip. In short, Mr. Muffoletto's breach of license claims are barred by the statute of limitations.

### Doctrine of Laches

A declaratory judgment is a form of discretionary relief "within the sound discretion of the court." *Sumrall v. State of Md. Cent. Collection Unit*, 150 Md. App. 290, 295 (2003). And when it does not serve a useful purpose or terminate a controversy,

19

a court has discretion to refuse a declaratory judgment. *Volkman v. Hanover Invs., Inc.*, 225 Md. App. 602, 613 (2015); *see Polakoff v. Hampton*, 148 Md. App. 13, 27 (2002). In addition, and "[a]s a general rule, an action for declaratory judgment will be barred to the same extent that the applicable statute of limitations bars an underlying action in law or equity." 8 M.L.E. *Declaratory Judgments* § 27 (2019); *see also* 26 C.J.S. *Declaratory Judgments* §120 (2019).[21]

Laches is an equitable defense intended to ensure fairness in the judicial system, and it "is based upon grounds of sound public policy by discouraging fusty demands for the peace of society." *Ross v. Bd. of Elections*, 387 Md. 649, 668 (2005) (quoting *Parker v. Bd. of Election Supervisors*, 230 Md. 126, 130 (1962)) (internal quotation marks omitted). It applies when an aggrieved party has burdened the defense by an unreasonable delay in asserting a cause of action. *Liddy v. Lamone*, 398 Md. 233, 244 (2007).

As to the requested equitable remedies, the circuit court ruled:

> I also, alternatively, rule that [Mr. Muffoletto's] claims to Injunctive Relief are barred by, by laches and, and he does request Injunctive Relief and he requests Declaratory Judgment. . . .

---

[21] 26 C.J.S. *Declaratory Judgments* § 120 (2019) ("Generally, the period of limitation applicable to the underlying action at law or suit in equity should be applied to an action for declaratory relief, and the defense of laches may bar an action for declaratory relief if the delay in bringing suit has been prejudicial."); *see also State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 587 (2014) (stating that claim seeking declaratory judgment and injunctive relief "sound in equity and, thus, are subject to [the laches] doctrine").

> . . . [A]ny Injunctive Relief is likewise barred by laches. . . . If there's an action at law that's analogous to the case before it . . . [and the applicable statute of limitations would bar that analogous action], the equity action will also be barred by the mere lapse of time without the necessity of showing prejudice.

We review that ruling *de novo. State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 585 (2014).

In this case, the mooring piles have been in their present location for thirty-five years, and it appears that only Mr. Tieder and Lee Brohawn, both of whom died before this suit was filed, could provide definitive information surrounding their current placement.[22]  In short, we agree with the circuit court that Mr. Muffoletto's injunctive relief claims were barred by the doctrine of laches, and affirm its declaration of rights, regarding the "pilings" under the "*presently recorded license and/or easement*," as set forth in the November 13, 2017 order.

## Adverse Possession

At trial, the circuit court determined that even if limitations or laches did not apply, Mr. Muffoletto lost any right to use the three feet of slip space through adverse possession:

> The court concurs that the license at issue in this case is essentially an easement or so analogous in character to an easement over riparian rights that the doctrine of adverse possession should apply.

> \* \* \*

> Since at least June 15[], 1984 [Mrs.] Towers and her predecessor in title have used, possessed and controlled three slip[s]–three feet of slip

---

[22] Mr. Tieder did not die prior to Mr. Muffoletto becoming aware of the issue.

space.  And I note for record, this is not just fast land, whose surface area is [a]ffected by the ebb and flow of the tides.  This is slip space having been marked, open and notoriously by pilings, the kind normally associated with boat slips, which is valuable property.

But again, this is a boating community, a water community very familiar with boat slips and the notorious markings that pilings establish boat slips.

Since at least June 15[], 1984 [Mrs.] Towers and her predecessors in title have controlled what [Mr. Muffoletto] contends to be his slip space for more than 20 years; therefore, the license associated with [Mrs.] Towers slip has been expanded such that [Mrs.] Towers easement and easement right over the riparian rights owned by the Council is 19 feet rather than 16 feet and conversely [Mr. Muffoletto]'s license, which is an easement over riparian rights of the Council, has been restricted from 16 feet to 13 feet under the doctrine of adverse possession.

In short, [Mr. Muffoletto] has lost three feet of slip space to which [Mr. Muffoletto] claims a right by virtue of license, again, under the doctrine of adverse possession.

*Contentions*

Mr. Muffoletto contends that the circuit court erred in finding that a portion of a non-corporeal license could be lost through adverse possession to a party having no more than an equal interest.  Mrs. Towers responds that this situation is so analogous to an adverse possession claim that the ways that adverse possession could cure any potential defects in title should not be ignored.

*Analysis*

CJ § 5-103 provides, in pertinent part:

(a) Within 20 years from the date the cause of action accrues, a person shall:
 (1) File an action for recovery of possession of a corporeal freehold or leasehold estate in land; or
 (2) Enter on the land.

22

(b)(1) The section does not affect the common-law doctrine of prescription as it applies to the creation of incorporeal interests in land by adverse use.

In *Kirby v. Hook*, 347 Md. 380, 403–04 (1997), the Court of Appeals explained the common-law doctrine of easement by prescription or adverse use:

> An easement is "a nonpossessory interest in the real property of another." *Boucher v. Boyer*, 301 Md. 679, 688 (1984) (citing *Condry v. Laurie*, 184 Md. 317, 320 (1945)). An easement can be created expressly or by implication. *Boucher*, 301 Md. at 688. One form of implied easement is an easement by prescription. *Id.* (citing *Dept. of Natural Res. v. Ocean City*, 274 Md. 1, 7–9 (1975)). A prescriptive easement arises when a party makes an adverse, exclusive, and uninterrupted use of another's real property for twenty years. *Condry*, 184 Md. at 321; *Cox v. Forrest,* 60 Md. 74, 79 (1883). A party's use is adverse if it occurs without license or permission. *Condry*, 184 Md. at 321; *see Zimmerman v. Summers*, 24 Md. App. 100, 112 (1975) (noting that asking permission implies recognition of the owner's right to prevent the use which is inconsistent with adversity). When a person has used a right of way openly, continuously, and without explanation for twenty years, it is presumed that the use has been adverse under a claim of right. *Condry*, 184 Md. at 321. The burden then shifts to the landowner to show that the use was permissive. *See Cox*, 60 Md. at 80.

(cleaned up). In other words, an easement is an incorporeal interest in real property.[23]

*See generally Goss v. C.A.N Wildlife Trust, Inc.*, 157 Md. App. 447, 457 (2004).

---

[23] 4 Herbert T. Tiffany, *The Law of Real Property* § 1 (3d ed. 1975, 2019 Cum. Supp.) provides:

> Things as the objects of rights are sometimes divided into corporeal and incorporeal things, a corporeal thing being a thing of a visible and tangible nature and an incorporeal thing being merely a right or group of rights which inheres in and is supported by a corporeal thing. The only corporeal thing of a "real" character is land, and whatever may be considered as a part thereof. A holder of incorporeal hereditament is considered the holder of form of interest in property. Of incorporeal things, Blackstone enumerates, under the name of "incorporeal hereditaments," ten varieties, to wit,

We begin by noting that "nearly all of the navigable waters, as well as the lands beneath them, are owned by the State for the benefit of all its citizens." *People's Counsel for Baltimore Cty. v. Maryland Marine Mfg. Co.*, 316 Md. 491, 501 (1989) (internal citation and quotation marks omitted). That said, owners of land adjacent to bodies of water have certain riparian rights. *See Gunby v. Olde Severna Park Improvement Ass'n*, 174 Md. App. 189 (2007), *aff'd*, 402 Md. 317 (2007).

> As we explained in *Conrad/Dommel, LLC v. West Development Co.*:
>
> The term "riparian rights" indicates a bundle of rights that turn on the physical relationship of a body of water to the land abutting it. These rights are significantly different from each other in many respects, and yet they share a common name just as riparian landowners attempt to share the common benefits that arise from adjacency to defined bodies of water. This bundle includes at least the following rights:
>
> (i) of access to the water;
> (ii) to build a wharf or pier into the water;
> (iii) to use the water without transforming it;
> (iv) to consume the water;
> (v) to accretions (alluvium); and
> (vi) to own the subsoil of nonnavigable streams and other "private" waters.

149 Md. App. 239, 268 (2003), (quoting from 1 *Waters and Water Rights*, § 6 .01(a) at 6–3, 6–4 (Robert E. Beck, ed., 1991, 2001 Repl. Vol.) (footnote omitted) ("*Waters*")).

---

(…continued)
advowsons, titles, commons, ways, offices, dignities, franchises, corodies, annuities, and rents.

Here, the riparian landowner[24] is the Council by virtue of its ownership of the fast land on and from which the piers and mooring piles are constructed. With the transfer of the previously reserved riparian rights to the Council in 1996, it acquired the related improvements including the finger piers and mooring piles. *See* Md. Code (1982, 2014 Repl. Vol., 2019 Cum. Supp.), § 16-201(a) of the Environment Article.[25] Mrs. Towers and Mr. Muffoletto hold what is titled respectively an easement or license for their slips.

*Black's Law Dictionary* (11th ed. 2019) defines an easement as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose." It defines a license as:

---

[24] "Generally, a riparian landowner is 'defined as one who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water, such as a river, bay, or running stream.'" *Kirby v. Hook*, 347 Md. 380, 389 (1997) (quoting *People's Counsel for Baltimore Cty. v. Md. Marine Mfg. Co.*, 316 Md. 491, 493 n. 1 (1989)).

[25] Md. Code (1982, 2014 Repl. Vol., 2019 Cum. Supp.), § 16-201(a) of the Environment Article provides:

> A person who is the owner of land bounding on navigable water is entitled to any natural accretion to the person's land, to reclaim fast land lost by erosion or avulsion during the person's ownership of the land to the extent of provable existing boundaries. The person may make improvements into the water in front of the land to preserve that person's access to the navigable water or, subject to subsection (c), protect the shore of that person against erosion. After an improvement has been constructed, the improvement is the property of the owner of the land to which the improvement is attached. A right covered in this subtitle does not preclude the owner from developing any other use approved by the Board. The right to reclaim lost fast land relates only to fast land lost after January 1, 1972, and the burden of proof that the loss occurred after this date is on the owner of the land.

a permission, usu. revocable, to commit some act that would otherwise be unlawful; esp., an agreement (not amounting to a lease or profit à prendre) that it is lawful for the licensee to enter the licensor's land to do some act that would otherwise be illegal, such as hunting game.

An easement, unlike a license, implies an interest in land; a license merely grants permission to perform an act that would otherwise be unlawful. *Condry v. Laurie*, 184 Md. 317, 320 (1945) (citations omitted).

While Mr. Muffoletto's slip documentation uses "license," and Mrs. Towers's uses "easement," they are essentially the same as the license submitted by the Council as an example of the "normal" format for slip licenses issued. For the purpose of this opinion, we consider both as licenses to use and exclude others from using the assigned slip area.

The question presented, whether a licensed area of a riparian right can be adversely possessed or lost by prescription, has not been decided in Maryland. As the Court of Appeals noted in *White v. Pines Community Improvement Ass'n*, 403 Md. 13 n.2 (2008):

> A question thus exists as to whether riparian rights can even be lost under the theory of adverse possession or prescription. We note that there are conflicting cases in other jurisdictions. We have never decided the issue. As the water level rises and the mean high tide mark advances landward, new waterfront properties come into being to which riparian rights become appurtenant. If water levels were to fall, the mean high tide mark would move channelward out into the waters, eventually moving past the area of riparian rights previously claimed by adverse possession. As only riparian rights would have been claimed by adverse possession (as in the present case), i.e., the right of access to water, and no fast land is claimed, how would title to the new land created channelward of the area where riparian rights have been claimed, be established? Considering the unique nature of riparian rights, it may be doubtful whether they can be obtained under the theory of adverse possession or prescription. How can a property right

26

which by its very nature must be attached to fast land, be severed from it? *How can an unattached riparian right exist—ever?*

(Emphasis added).

In the circuit court, the Council explained that "there is no suggestion by any party to this case that [its] riparian rights have been taken or lost by adverse possession. Rather, Mr. Muffoletto's license/easement right over three feet of Boat Slip No. 33, as it allegedly existed in 1983, has been lost by adverse possession." And Mrs. Towers, recognizing that the Council's ownership of riparian rights "taken as a whole with respect to all of the riparian improvements" is not subject to challenge, argues the use of "readily identifiable parts of [its] riparian rights" licensed to unit owners can be prescriptively acquired because the licenses are "the equivalent of an easement on fast land" and therefore easement principles should apply.

We agree that the issue is not whether the riparian rights of the Council have been adversely possessed and, therefore, we see no need to wade into the murky waters of whether riparian rights can be separated from the land from which the rights flow. An easement or a license of a riparian right does not equate to the ownership of a riparian right. *See Gwynn v. Oursler*, 122 Md. App. 493, 498–500 (1998) (granting of an easement does not necessarily make the grantee of the easement a riparian owner) (citation omitted); 1 *Waters*, § 7.04(a)(3) at 7–105 (3d ed. 2019) ("The conveyance of an easement relating to water does not carry any riparian or other rights beyond those strictly necessary to the easement's expressed purposes.").

We will assume – without deciding – that the area of a licensed slip space is subject to adverse possession or prescription by one licensee against another licensee and the Council. And, we will also assume that the mooring piles separating the two slips were moved and that the twenty-year period began in June of 1984.[26] The Brohawn Company, having reserved riparian rights, stood in the shoes of the Council until July 9, 1996, or approximately twelve years. The record establishes payment for the license to use slip 32, but nothing in the record indicates a Council policy regarding the relocation of moving mooring piles prior to 1999. Mr. Tieder sold to Mrs. Towers on July 25, 2000 and the Council issued to her the license to slip 32 "as now constructed," which included the three feet at issue in this case. Therefore, slip 32 has been in its present configuration with the permission of the riparian owner since that time, which is less than the prescription period. Mrs. Towers's use of the additional three feet is not adverse to the Council and is not adverse to Mr. Muffoletto because his license is for slip 33 in its present configuration.[27]

---

[26] Based on the record, it is unclear whether any license issued to Mr. Tieder was before or after the assumed movement of the piles. Moreover, it would appear likely that Lee Brohawn was well aware that slip 32 was nineteen-feet wide before riparian rights were turned over to the Council.

[27] By deed, dated August 23, 2004, Mr. Muffoletto took title to unit 312-B, along with the license for slip 33. The deed provides:

> [Mr. Godfrey] does hereby assign to [Mr. Muffoletto] all right, title and interest of [Mr. Godfrey] in and to the Exclusive License for Use of Boat Slip No. 33, pursuant to, and with the benefit of, and subject to the terms, covenants, conditions, obligations and assessments set forth in the instrument entitled, "Cambridge Landing Townehouse Condominium,

**Denial of Summary Judgment to Mr. Muffoletto**

The circuit court denied Mr. Muffoletto's Motion for Summary Judgment, and characterized the motion as a "modified pleading" or a "rant." More specifically, the circuit court determined that the motion "lacks affidavit quality evidence required for a Motion for Summary Judgment."

Mr. Muffoletto contends that he offered the court unambiguous documents, notably the Site Plan, which supported a grant of summary judgment in his favor, and that its denial was an abuse of discretion. He also adds that "[he] is entitled to a declaration that [the mooring piles] are in the incorrect location and an injunction requiring them to be moved" because "unambiguous language" in the documents establishes that the slips should be of equal width.

*Standard of Review*

"[O]n appeal, the standard of review for a denial of a motion for summary judgment is whether the trial judge abused his [or her] discretion and in the absence of

---

(…continued)
> Exclusive License for Boat Slip", dated April 7, 1983 and recorded among the said Land Records in Liber P.L.C. No. 265, folio 291.

The April 7, 1983 Exclusive License for Boat Slip states:

> NOW THEREFORE THIS LICENSE WITNESSETH, that in consideration of the premises, the GRANTOR [Brohawn Company] does hereby grant and convey unto the LICENSEE [the Council], the exclusive use of slip No. 33, as now numbered, *and as now constructed*, which slip is adjacent to [unit 312-B][.]

(Emphasis added).

such a showing, the decision of the trial judge will not be disturbed." *Fischbach v. Fischbach*, 187 Md. App. 61, 75 (2009) (internal citations and quotation marks omitted). We review facts in the record and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *See Gurbani v. Johns Hopkins Health Sys. Corp.*, 237 Md. App. 261, 267 (2018)

*Analysis*

A party moving for summary judgment bears the burden of demonstrating the absence of material factual issues. *Carter v. Aramark Sports and Entm't Servs., Inc.*, 153 Md. App. 210, 224–25 (2003).

The submitted Site Plan is "unambiguous" only to the extent that it indicates a proposed width of fourteen feet and seven inches for the slips numbered 27 to 33, which includes slips 32 and 33.[28] And had the slips been constructed according to the Site Plan, the combined width of the slips 32 and 33 would be twenty-nine feet and two inches. But as constructed, the area is actually thirty-two feet, which is approximately three feet more than the width indicated in the Site Plan.

Mr. Muffoletto argues that the Site Plan demonstrates that the "original location" of the piles differs from their present location. As he sees it, the Site Plan and John W. Tieder, III's affidavit make it undisputed that the piles were moved and never "returned to their original locations." Our review of the Site Plan and the title documents indicates

---

[28] According to the Site Plan, the combined width for slips 32 and 33 is twenty-nine feet, which would make each slip, if equal, fourteen-feet-and-seven-inches wide.

30

that none of them clearly reflect the actual installation of the mooring piles. And, statements in the affidavits of Terry Robbins, George Apple, and John W. Tieder, III advanced different accounts as to whether, why, and when the piles were ever moved.

As discussed above, Mr. Muffoletto challenges the validity of Mrs. Towers's slip "easement," arguing that "there is no consent from the unit owners." He characterizes that "easement" as "bogus" and "proof of deceit." On the other hand, the deed to Mrs. Towers conveyed the ownership of unit 311-A and the prior owner's interest in slip 32. And, the deed of easement for slip 32 was signed by the Council's President and attested by its Vice President, without any challenge by the unit owners prior to Mr. Muffoletto's claim. In short, the submitted documentation did not establish undisputed facts supporting Mr. Muffoletto's Motion for Summary Judgment, and there was no abuse of discretion in denying it.

## II.

### Sanctions for Discovery Violations

*Standard of Review*

We "review[] for abuse of discretion a trial court's decision to impose, or not impose, a sanction for a discovery violation." *Dackman v. Robinson*, 464 Md. 189, 231 (2019). And we consider only the grounds relied on by the trial judge. *Attorney Grievance Comm'n of Md. v. Kent*, 447 Md. 555, 577 (2016).

*Contentions*

Mr. Muffoletto contends the circuit court imposed sanctions for discovery violations without considering the factors set forth in *Taliaferro v. State*, 295 Md. 376, 390 (1983), and therefore, abused its discretion.

Mrs. Towers responds that the court "reviewed the extensive documentation of [Mr. Muffoletto's] refusal to be candid in his discovery responses and more particularly to disclose whatever evidence he might have to present at trial to support his claims." In her view, the court did not err or abuse its discretion in finding that she "had been required to incur significant legal fees to try to get a straight answer to the key question raised by the [c]ourt's earlier ruling [on May 17, 2017]" and in entering an award of sanctions based on legal expenses that she incurred to get proper discovery requests.

*Analysis*

The award of sanctions for discovery-related violations, is governed by Maryland Rule 2-433, which states, in pertinent part:

> (a) . . . Upon a motion filed under Rule 2-432 (a), the court, if it finds a failure of discovery, may enter such orders in regard to the failure as are just . . . .
>
> \*    \*    \*
>
> Instead of any of those orders or in addition thereto, *the court, after opportunity for hearing, shall require the failing party or the attorney advising the failure to act or both of them to pay the reasonable costs and expenses, including attorney's fees, caused by the failure*, unless the court finds that the failure was substantially justified or that other circumstances make an award of costs and expenses unjust.
>
> \*    \*    \*
>
> (c) . . . *If a person fails to obey an order compelling discovery, the court, upon motion of a party and reasonable notice to other parties and all*

*persons affected, may enter such orders in regard to the failure* as are just, including one or more of the orders set forth in section (a) of this Rule. . . .

\* \* \*

(f) . . . Within 15 days after the filing of a statement in support of a request for an award of costs, expenses, or attorneys' fees, a party against whom the award i[s] sought may file a response.

(Emphasis added).

Circuit courts have "very broad discretion" to determine whether sanctions should be imposed. *Pinsky v. Pikesville Recreation Council*, 214 Md. App. 550, 590 (2013) (quoting *North River Ins. Co. v. Mayor and City Council of Baltimore*, 343 Md. 34, 47 (1996)). But when sanctions are imposed, a circuit court should consider the factors set out in *Taliaferro*, 295 Md. at 390–91, and whether the sanctioned violations were "persistent and deliberate" before imposing sanctions. *Kent*, 447 Md. at 577.

In pertinent part, the *Taliaferro* factors are:

(1) Whether the disclosure violation was technical or substantial,
(2) The timing of the ultimate disclosure,
(3) The reason, if any, for the violation,
(4) The degree of prejudice to the parties respectively offering and opposing the evidence,
(5) Whether any resulting prejudice might be cured by a postponement, and, if so, the overall desirability of a continuance.

*Taliaferro*, 295 Md. at 390–91 (enumeration added). But it is not necessary for the court to go through a checklist and note its consideration for each factor. *See Kent*, 447 Md. at 578–81. "Frequently these factors overlap. They do not lend themselves to a compartmental analysis." *Id.* at 577 (internal citations omitted). And, for that reason, "[w]e do not look at each incident in isolation, but rather at the entire history and context

33

of the case[.]" *Valentine-Bowers v. Retina Grp. of Washington, P.C.*, 217 Md. App. 366, 380 (2014).

In *Valentine-Bowers*, the plaintiff, Leslie Valentine-Bowers, had failed to file properly executed, responsive interrogatories, failed to respond to a Request for Production, and failed to appear for a deposition. *Id.* at 369–70. The defendant filed a motion to compel Ms. Valentine-Bowers to respond to its discovery requests. The circuit court granted the motion and ordered her to respond by a certain date. *Id.* at 370. After she again failed to respond in disregard of the court's order, the court dismissed the case and she appealed to this Court. *Id.* at 375–77.

We held that circuit court did not abuse its discretion because Ms. Valentine-Bower's discovery violations were not technical, "but substantive and substantial." *Id.* at 380–82. We explained that "belated disclosures [are] material and relevant to appellees' ability to prepare a defense," and that "[d]isregard of discovery deadlines constitutes a 'substantial violation' because the plaintiff, as the party initiating suit, has an affirmative duty to move her case toward trial[.]" *Id.* at 380 (internal citations omitted). We also upheld the court's finding of substantial prejudice because, "[a]s the court put it, '[t]he memory of witnesses fade. The ability to locate witnesses becomes an issue.'" *Id.* at 385; *see Kent*, 447 Md. at 579 (explaining that delayed delivery of incomplete discovery responses "essentially depriv[ed] Petitioner of any meaningful opportunity to review the responses in advance").

*(1) Whether the disclosure violations were technical or substantial*

Here, there were both technical and substantial violations. The technical violations included Mr. Muffoletto's failure to certify his initial set of Answers to the Council's Interrogatories, which was not corrected until the October 2, 2017 hearing, and his failure to submit notice of service of discovery to the court.

On the other hand, Mr. Muffoletto's failure to comply with the September 8, 2017 order was a substantial violation, as the circuit court explained at the October 2, 2017 hearing:

> Well, here's how I see it . . . . this goes back to the initial Motion for Order to Compel Proper Discovery Responses . . . So, so Mr. Muffoletto was certainly on notice that there was a discovery dispute. I issued my order . . . [which went out on] [t]he 8th day of September 2017 and there was absolutely no response from Mr. Muffoletto to that order. There was also no response to either the Limited Motion for Sanctions and Correction to Limited and Supplement to Limited Motion for Sanctions. That wasn't filed on or before September 28, 2017 as I had requested . . . The problem here is Mr. Muffoletto had an opportunity to respond and didn't respond to even those. It just shows a contempt for the process . . . And I do believe that the sanctions are appropriate[.]

> *       *       *

> I clearly articulated what would happen if Mr. Muffoletto did not respond to the discovery requests identified in the Motion For Order to Compel, which he didn't do that; and I also instructed him, or his counsel, to file responses to Defendant's Limited Motion for Sanctions and Correction and Supplement to Defendant's Limited Motion for Sanctions by September 28, 2017, which he did not do as well . . . .

And at the November 8, 2017, hearing, the circuit court further noted:

I do think that the defendant in this case was entitled to the discovery. Mr. Muffoletto never provided the discovery directly to [Mrs.] Towers as I, as I had ordered. Never even filed a response to the Motion for Limited Sanctions or Supplement.

*       *       *

35

Had, you know, trial been on the horizon there's a lot of anxiety that the defendant has, [Mrs.] Towers has. Specifically [Mrs.] Towers. [Mrs.] Towers is her own entity. She's an individual person that's hired counsel and she was entitled to the information. She was entitled to answers. She probably – her, her – everything was probably riding, her anxiety, her concern about her own property and what she owned and the value of her property rode, rode with the, you know, the unknown that should have been known based upon the rules that are established, the discovery rules that are established. And certainly it was simple information that could have been provided at multiple junctures to [Mrs.] Towers and it was never provided.

We agree. Mr. Muffoletto's disregard of discovery deadlines constituted a substantial violation, and the responses that Mrs. Towers sought were material and relevant to her ability to prepare a defense. *See Valentine-Bowers*, 217 Md. App. at 380.

### *(2) The timing of the ultimate disclosure*

Mr. Muffoletto did not correct the substantial violation: instead, the other parties were able to communicate with each other regarding the missing discovery information.

### (3) *The reason, if any, for the violation`*

Mr. Muffoletto never responded to either Mrs. Towers's Limited Motion for Sanctions or its amended version. The court was not required to presume an innocent reason for the violations; it was the responsibility of the party charged with a violation to offer a reason to the court. Mr. Muffoletto offered no excuse for the repeated violations and he did not deny that his actions were deliberate.

During the October 2, 2017 and November 8, 2017 hearings, Mr. Muffoletto claimed that there was no violation because he had provided all of the information he possessed. The circuit court did not find this to be persuasive because, in his complaint, Mr. Muffoletto indicated that he was aware of evidence that either the piles were moved

36

sometime between 1996 and 2000, or that it was documented that the slips would each be sixteen-foot wide.[29]  Evidence to that effect was not provided to Mrs. Towers; he claimed instead that the Council had all of the evidence.

Acknowledging that Mr. Muffoletto provided the Council with responses consistent with what Mrs. Towers had sought, the court explained:

> [Mr. Muffoletto] didn't follow the procedures and didn't serve the rest of the parties involved in the litigation.  The only – it's only by almost grace here that the parties here communicated and, and [Mrs. Towers's counsel] was able to glean from responses that there was information that Mr. Muffoletto provided to [the Council].
>
> So again, this is his – this is all on [Mr. Muffoletto].

It was not the duty of Mrs. Towers to seek answers from the Council, and the fact that Mrs. Towers ultimately had access to Mr. Muffoletto's responses to the Council did not justify ignoring her discovery requests and the court's order.  It was, as we explained in *Valentine-Bowers*, "the duty of [Mr. Muffoletto] to move [his] case forward . . . and

---

[29] The Council gained riparian rights in 1996, and Mrs. Towers bought her condominium in 2000. Mr. Muffoletto bought his condominium in 2004.  Paragraph 16 of Mr. Muffoletto's complaint reads:

> Upon information and belief, after the Council took title to the Boat Slips, and before Mrs. Towers' and Mr. Muffoletto's ownership of their respective condominium units and corresponding boat slips, predecessors in title to Mrs. Towers and Mr. Muffoletto moved the pilings demarking the Towers Slip and the Muffoletto Slip[.]

Paragraph 17 of Mr. Muffoletto's complaint reads: "[Mr. Muffoletto's] license to Slip 33 entitle[s] him to a slip, as constructed in 1983, which [is], upon *information* and belief, of equal size to the Towers Slip[.]"  (Emphasis added).

[he] shirked this duty and offered no good cause for [his] dilatory conduct." 217 Md. App. at 384 (internal citations and quotation marks omitted).

### (4) The degree of prejudice to the parties respectively offering and opposing the evidence

In the circuit court and on appeal, Mr. Muffoletto claims that his discovery violations did not prejudice Mrs. Towers. At the October 2017 hearing, he asked: "[b]ut what is the prejudice on which these sanctions are based, because I really don't see that? The court responded:

> [T]he prejudice is we're on October 2 here and [counsel for Mrs. Towers] is sitting here with a client that has probably paid for his services and he doesn't have those responses[.]

And at the November 2017 hearing, the court added:

> [Mrs. Towers's counsel] was trying to pin jello to a wall. . . . Mr. Muffoletto was filing all kinds of motions and letters to the court and I think that the defendants in this case were doing their very best to just establish, "What are the facts? What will be the facts established at trial? What will be the best evidence you have to, to – in terms of what are the – you know, what, what evidence do you have to establish the facts that are at the gravamen of the claim?" And that's what they were doing.

We are persuaded, as was the circuit court, that Mrs. Towers was prejudiced. She had to choose between proceeding without complete discovery and being at the hearing unprepared, or to engage counsel to proceed under the Rules to have Mr. Muffoletto comply with her discovery requests. She chose to seek compliance under the Rules and incurred substantial attorney's fees in doing so.[30]

---

[30] The circuit court ordered an award of $4,331:

*(5) Whether any resulting prejudice might be cured by a postponement*

At the October 2017 hearing, the circuit court asked Mrs. Towers whether additional time may cure the resulting prejudice:

> Now, I have a question for you, [Mrs. Towers's counsel]. The Limited Motion For Sanctions, before I ask [Mr. Muffoletto's] counsel for his response, is this something that you believe – because, again, I was familiar in the pleadings that you were receiving I guess responses that were propounded to [the Council's counsel's] Interrogatories that he was – at some point you realized I think maybe from one of [Mrs.] Towers's pleadings that there was a response and – or there was some admission and then [the Council's counsel] shared that with you. If – is this something that needs to be ruled on today that has prejudiced you; the fact that we – the court hasn't ruled on the Limited Motion For Sanctions? That you would need additional time for –
>
> Mrs. Towers, through counsel, responded that it would not, because, at that point,

she and the Council had already provided each other with the discovery deficits and she had already incurred legal expenses in her efforts to have Mr. Muffoletto respond to her discovery requests.

In sum, the court did not abuse its discretion in imposing sanctions on Mr. Muffoletto for one half of Mrs. Towers's attorney's fees for the discovery violations.

**CONCLUSION**

---

(…continued)

> I'm not going to order the full, full amount though, [Mrs. Towers's counsel]. The amount – again, I do think that, again, that what's been asked for here is $8,662.53. The award will be – I'm just, I'm just splitting the difference. I'm splitting it. $4,331 will be the award of the sanctions, monetary sanctions for the machinations that defense counsel had to go through in order to prepare for the trial when trial was on the horizon. It probably would have been a higher award had, had this case not been resolved today as – in a Motion for Summary Judgment.

39

Whether the mooring piles separating boat slips 32 and 33 were moved, and if moved, when and under what circumstances, we do not know. And the people most likely to know have died. What we do know is that when the Brohawn Company conveyed the riparian rights to the Council in 1996, the mooring piles clearly designating the widths of slips 32 and 33 were as they are now and have been since June 1984; that the Council obtained the slips as constructed in 1996 and subject to the licenses previously issued by the Brohawn Company; and that the licenses subsequently issued or reissued by the Council for slips 32 and 33 "as constructed" reflect the differences in width.

Mr. Muffoletto knew or should have known about the difference in the width of the two slips in 2004 when he purchased his unit and licensed the slip in its present configuration. Yet he took no action until November of 2016, twelve years later, which is the type of delay that statutes of limitations and the equitable doctrine of laches seek to prevent.

**JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY AFFIRMED; CASE REMANDED TO THAT COURT FOR ENTRY OF A SEPARATE DECLARATORY JUDGMENT IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**

40